Case: 1:21-mj-00198
Assigned to: Judge Harvey, G. Michael
Assign Date: 2/3/2021
Description: COMPLAINT W/ARREST WARRANT

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Case No: |
| | : | |
| v. | : | |
| | : | **VIOLATIONS:** |
| | : | |
| **TRISTAN CHANDLER STEVENS,** | : | **18 U.S.C. § 111(b)** |
| | : | **(Assaulting, resisting, or impeding certain** |
| Defendant. | : | **officers or employees)** |
| | : | |
| | : | **18 U.S.C. § 231(a)(3)** |
| | : | **(Civil Disorder)** |
| | : | |
| | : | **18 U.S.C. § 1752(a) & (b)** |
| | : | **(Restricted Building or Grounds)** |
| | : | |
| | : | **40 U.S.C. § 5104(e)(2)** |
| | : | **(Violent Entry or Disorderly Conduct)** |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT
## AND ARREST WARRANT

I, Steven A. Weatherhead, being first duly sworn, hereby depose and state as follows:

## PURPOSE OF AFFIDAVIT

1. This Affidavit is submitted in support of a Criminal Complaint charging TRISTAN CHANDLER STEVENS ("STEVENS") with violations of 18 U.S.C. §§ 111(b), 231(a)(3), 1752(a), (b), and 40 U.S.C. § 5104(e)(2).

## AGENT BACKGROUND

2. I have been a Special Agent with the FBI since October of 2007, where I am currently assigned to a squad which investigates narcotics trafficking offenses. Since October 2008, I have been working on federal narcotics investigations and have participated in investigations which have led to the indictments and arrests of narcotics distributors. Since 2007, I have received training and experience in interviewing and interrogation techniques, arrest

procedures, search and seizure, narcotics, white collar crimes, search warrant applications, and various other crimes. In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. I have also had extensive experience with various forms of electronic evidence, such as cell phone data and social media evidence, as it relates to criminal activity.

3. I am one of the investigators assigned to an ongoing investigation by the FBI, United States Capitol Police ("USCP"), Metropolitan Police Department ("MPD"), and other law enforcement agencies, of riots and civil disorder that occurred on January 6, 2021, in and around the United States Capitol grounds. Since I became involved in this investigation on January 6, 2021, I have conducted interviews, reviewed public tips, reviewed publicly available photos and video, and reviewed relevant documents, among other things.

4. The facts in this affidavit come from my review of the evidence, my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have hearsay knowledge. This affidavit is intended to show simply that there is sufficient probable cause for the requested arrest warrant and does not set forth all of my knowledge about this matter.

## BACKGROUND

5. On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, located at First Street Southeast, Washington, District of Columbia. During the joint session, elected members of the United States House of Representatives and

Senate met in the United States Capitol to certify the vote count of the Electoral College for the 2020 Presidential Election, which took place on November 3, 2020.

6. The United States Capitol is secured 24 hours a day by security barriers and USCP occupy various posts throughout the grounds. Restrictions around the United States Capitol include permanent and temporary security barriers and posts manned by USCP. USCP officers wore uniforms with clearly marked police patches, insignia, badges, and other law enforcement equipment. Only authorized people with appropriate identification are allowed access inside the United States Capitol. On January 6, 2021, the exterior plaza of the United States Capitol was also closed to members of the public.

7. The January 6, 2021 joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Michael R. Pence was present and presiding, first in the joint session, and then in the Senate chamber.

8. As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the United States Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the United States Capitol building and USCP were present, attempting to keep the crowd away from the Capitol building and the proceedings underway inside. As the certification proceedings were underway, the exterior doors and windows of the Capitol were locked or otherwise secured.

9. At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades, and past officers of the USCP, and the crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in

the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by the USCP or other authorized security officials.

10. A short time later, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. As such, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day. In light of the dangerous circumstances caused by the unlawful entry to the United States Capitol, including the danger posed by individuals who had entered the United States Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the United States Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 pm after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

11. After the Capitol was breached, USCP requested assistance from MPD and other law enforcement agencies in the area to protect the Capitol, keep more people from entering the Capitol, and expel the crowd that was inside the Capitol. Multiple MPD officers and other law enforcement officers came to assist.

12. During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the United States Capitol building without authority to be there.

**STATEMENT OF FACTS SUPPORTING PROBABLE CAUSE**

13. By 3:00 PM on January 6, 2021, protesters had engulfed the west side of the Capitol and were climbing on the scaffolding in front of building as well as various features of the building. Although the Capitol Building had already been breached and protesters had flooded in through several entrances, a group of MPD officers and members of the USCP or other agencies had been able to hold their position and deny entry through the very prominent entrance of the lower west terrace. To enter the Capitol through the lower west terrace, one must walk through a short tunnel with a series of glass doorways. Shortly before 3:00 PM, a group of officers were maintaining a line at the second set of glass doors inside the tunnel. Officers reporting to the scene rushed to the tunnel from within the building while protesters outside of the tunnel continued to summon more men to push their way through the tunnel. A growing number of protesters made their way into the tunnel with a variety of tools and weapons and the tunnel became the point of one of the more intense and prolonged clashes between protesters and law enforcement at the Capitol on that day. Many of the protesters in the tunnel were recording video and many of the videos continue to circulate Internet channels, social media, and the news.

14. Portions of the rioters' effort in the tunnel to get through the lower west terrace doors were captured both in video surveillance from USCP camera in the tunnel and in video footage posted to YouTube (hereinafter, YouTube Video 1). In YouTube Video 1, which was reviewed by your affiant, a large group of rioters attempted to break through the line of uniformed law enforcement officers who were in place to prevent rioters from entering the lower west terrace door of the United States Capitol. Law enforcement officers are at the front of the line attempting to stop numerous rioters from gaining access to the United States Capitol Building.

15. Around 2:49 p.m., surveillance video shows a white male with brown hair, a brown beard, and glasses, wearing a brown jacket with a lighter colored hood and a black

backpack, who was subsequently identified as STEVENS, as explained below, can first be seen near the entrance of the tunnel.  STEVENS can then be seen entering the tunnel with the rioters, who begin to push against the officers as a group.  STEVENS can be seen in surveillance footage yelling and placing 1, then 2, and then 3 fingers in the air, with the crowd then pushing forward as he puts up 3 fingers.  Surveillance footage shows that this continues a few times until someone at the front urges everyone to back up, at which point Stevens can be seen waiving to the crowd to back up.  In both the surveillance footage and YouTube Video 1, STEVENS (in the red box in the still from YouTube Video 1, in Figure 1, below) then exits the tunnel with some of the rioters but stays near the arch by the entrance, looking towards the direction of where the front line of the rioters continue to clash with law enforcement inside the tunnel.



*Figure 1 - YouTube Video 1*

16. Then, at approximately 2:56 p.m., STEVENS can be seen in surveillance footage going back into the tunnel with additional rioters walking toward the line of law enforcement guarding the lower west terrace doors.  STEVENS can be seen holding what appears to be a cellular phone in his hand with the light on as he walks forward into the tunnel.

17. Then, at approximately 2:58 p.m., STEVENS can be seen in surveillance footage turning around and again exiting the tunnel as other rioter continue to try force their way through

the lower west terrace doors.

18.     Then, at approximately 3:03 p.m., STEVENS (as indicated in the red box in Figure 2 below) can be seen in surveillance footage again returning to the tunnel and moving towards the line of law enforcement officers guarding the lower west terrace doors, as rioters push in unison against the officers.



Figure 2 - Surveillance Video

19.     As captured in YouTube Video 1, inside the tunnel, rioters use police riot shields and police riot batons to combat uniformed law enforcement officers. Unidentified rioters can also be overheard planning and implementing a rotation of rioters to have the "fresh" rioters up front to combat law enforcement, with various unidentified individuals yelling "we need fresh patriots in the front" and "we need fresh people."  Unidentified rioters are heard instructing the front line of rioters to make a "shield wall" to prevent law enforcement from controlling rioters with oleoresin capsicum spray ("O.C. spray").  Around the same time, STEVENS can be seen grabbing one of the riot shields that is being passed forward by others in another video posted to

YouTube ("YouTube Video 2"), as shown in Figure 3, below. That conduct depicted in YouTube Video 2 is corroborated by surveillance footage which shows STEVENS with the riot shield around 3:06 p.m. Figure 4, below, is a still obtained from the surveillance footage; STEVENS is shown within the red box in Figure 4



Figure 3 - YouTube Video 2



Figure 4 - Surveillance Video

20. YouTube Video 1 shows that, after STEVENS then pushes his way to the front of the line of rioters with the shield, STEVENS was holding the shield and using it to push against the line of officers as the rioters add their weight and push him too. YouTube Video 1 also shows that, at one point, the shield STEVENS is holding also strikes an officer in the helmet. At another point, YouTube Video 1 also shows an officer thrust his baton over a shield in an

apparent attempt to poke one of the protesters and shows that STEVENS grabbed the baton and, in a brief struggle, tried to take it from the officer, as shown in Figure 5, below.



*Figure 5 - YouTube Video 1*

21. Then, at approximately 3:11 p.m., STEVENS, who no longer holds a shield, can be seen in surveillance footage again exiting the tunnel and moving back away from the line of law enforcement officers guarding the lower west terrace doors.

22. Then, around 4:15 p.m., STEVENS can be seen in surveillance footage returning to the tunnel, with the grey hood on his head but otherwise appearing the same, and once again joining a large group of rioters pushing against law enforcement officers guarding the lower west terrace doors. The rioters push as a crowd against the officers for a few minutes. Around 4:19 p.m., STEVENS can be seen waiving the group back and begins exiting the tunnel again as law enforcement officers finally push the group back to the arch entrance.

### *Identification of STEVENS*

23. Law enforcement spoke with Witness 1 and Witness 2, both of whom have known STEVENS personally for many years. Witness 1 and Witness 2 were each shown the below still,

Figure 6, from another video of the event posted to YouTube, ("YouTube Video 3"). Each identified the individual on the left whose face is visible in the still as STEVENS. Both were able to provide the date of birth for STEVENS and additional details, including his phone number – all of which matched information previously known to law enforcement regarding STEVENS. WITNESS 1 and WITNESS 2 also confirmed that STEVENS travelled to Washington D.C. in the first part of the month of January 2021.



*Figure 6 –YouTube Video 3*

24.     Law enforcement also separately spoke with Witness 3, who has known STEVENS personally for months. Witness 3 was shown Figures 7, 8, and 9 from the videos described above. Witness 3 identified the individual in the photographs as STEVENS.



*Figure 7 – YouTube Video 1*



*Figure 8 – YouTube Video 1*



*Figure 9 – YouTube Video 1*

25. In addition, your affiant and other investigators examined several photographs extracted from videos recorded by protesters inside or just outside of the tunnel with several photographs of STEVENS from his social media accounts, as well as photos from known government sources. Based on that comparison, your affiant concurs that STEVENS resembles the individual pictured above. Notably, in an Alabama driver's license photograph of STEVENS, a mole is visible on his right cheek. In YouTube Video 3, which was partially taken outside of the tunnel, a mole can be seen on the same location on STEVENS's right cheek as he walks past the camera, as circled in the still below.



*Figure 10 – YouTube Video 3*

**CONCLUSION**

For the reasons set forth above, I submit there is probable cause to believe that STEVENS violated:

1. **18 U.S.C. § 111(b)**, which makes it a crime to forcibly assault or interfere with any person designated in section 1114 of this title 18 while engaged in or on account of the performance of official duties and uses a deadly or dangerous weapon (including a weapon intended to cause death or danger but that fails to do so by reason of a defective component). Persons designated within section 1114 include any person assisting an officer or employee of the United States in the performance of their official duties.

2. **18 U.S.C. § 231(a)(3)**, which makes it a crime to commit or attempt to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function. ("Civil disorder" means any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual. "Federally protected function" means any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof; and such term shall specifically include, but not be limited to, the collection and distribution of the United States mails. 18 U.S.C. §232(1).)

3. **18 U.S.C. § l752(a) and (b),** which make it a crime to (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engage in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions; or (4) knowingly engage in any act of physical violence against any person or property in any restricted building or grounds; or attempts or conspires to do so. The punishment for violating these provisions by using or carrying a dangerous weapon is imprisonment for up to 10 years. 18 U.S.C. § 1752(b)(1)(A). For purposes of Section 1752 of Title 18, a restricted building includes a posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or any building or grounds so restricted in conjunction with an event designated as a special event of national significance; and

4. **40 U.S.C. § 5l04(e)(2),** which makes it a crime for an individual or group of individuals to willfully and knowingly (D) utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress; or (F) engage in an act of physical violence in the Grounds or any of the Capitol Buildings.

As such, your affiant respectfully requests that the court issue an arrest warrant for STEVENS.

The statements above are true and accurate to the best of my knowledge and belief.

Respectfully Submitted,

_____
Steven A. Weatherhead
Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this 3rd day of February 2021.

_____

U.S. MAGISTRATE JUDGE